ELLIS, Judge.
Plaintiff filed suit against the workmen’s compensation insurance carrier of his employer for the maximum amount per week, alleging total and permanent disability as a result of an accident on or about April 6, 19S8, and for attorney fees and 12% on the. total amount of past-due compensation payments as statutory penalties.
Judgment was originally rendered by the lower court as prayed for, subject to a credit for all compensation payments theretofore paid. Upon rehearing the judgment was amended, disallowing the penalties and attorney fees, and the defendant appealed and the plaintiff has answered the appeal re-urging its prayer for attorney fees and penalties and an affirmance in other respects of the judgment.
The only issue is one of disability. The defendant contends that the plaintiff had recovered and was able to return to the same work as prior to the accident, on the day that the compensation payments were discontinued by it. On the other hand the plaintiff contends that he was totally and permanently disabled and that he is entitled to the attorney fees and penalties.
The facts are that on or about April 6, 1958, the Bill Jobe Water Well Service was drilling shallow oil wells at Anse LeButte Oday Richard was working as a roughneck for this company at the time. While thus occupied, he was forcefully struck in the lower right abdomen when a cable came loose and a heavy tong attached to the cable hit him. After the plaintiff was struck by the tong, he was rendered unconscious for a short time. When he was revived, he became nauseated and rested a while before returning to his work. He worked for three days after the accident, despite the fact that he was suffering from the effects of the accident. Finally his pain and other symptoms caused plaintiff to go to Dr. Larry Shipp. He was carefully examined by Dr. Shipp, in view of the possibility that he might have a ruptured kidney. Tests for this injury were negative. Dr. Shipp also found acute spasm in plaintiff’s lower back area and found loss of sensation in plaintiff’s toes.
Dr. Shipp, of the Kaplan Clinic, referred the plaintiff to Dr. Meuleman, an orthopedic specialist of Lafayette, Louisiana, who examined plaintiff on May 7, 1958 and found that the back movements of plaintiff were quite limited accompanied by muscle spasms; that sciatic tension tests were quite positive bi-laterally but more so on the right with radiated pain into the extremities; the long toe extensor on the right showed a definite paresis and sensory perception to pin prick was impaired over the distribution of the fifth lumbar nerve root; pressure on the back caused local pain in the lumbo-sacral area with radiation into the right lower extremity. In addition, a study of the X-ray films disclosed that plaintiff had suffered a childhood disease of the bone of the hip joint which had left a deformity of the hip which consisted of “a deformity of the head and neck of both femurs with relative upper displacement of the shaft of the femur in relation to the acetabuli. These changes are consistent with an old heal bilaterally slipped femoral epithyses. The joint space is narrowed near the superior lip of the acetabulum bilaterally.”
The preponderance of the evidence is to the effect that this condition was not affected by the accident and was in no way connected with it.
Dr. Meuleman concluded as a result of his examination that the plaintiff’s back showed definite evidence of nerve root irritation, as evidenced by the restriction of motion, . the muscle spasm, the partial paresis of the long toe extensor muscle, as well as the sensory dermatome pattern, which was quite definite. He recommended hospitalization, as well as general conservative measures for the back condition and an evaluation at the end of three weeks.
As a result of Dr. Meuleman’s recommendation, plaintiff went to Dr. Harold G. *856 Trahan, on May 24, 1958, and this doctor, after obtaining the history from, the plaintiff contacted Dr. Shipp of Kaplan, La., for further details. He then examined the plaintiff and hospitalized him at Palms Hospital, Abbeville, Louisiana “for conservative treatment for what is thought to be nerve root irritation probably due to heriated (herniated) Disc.” There was no improvement of the patient’s condition, and on May 29, 1958 he was released from the hospital and referred back to Dr. William L. Meuleman for definitive treatment by Dr. Trahan.
On the 10th of June, 1958 plaintiff was seen again by Dr. Meuleman and although the plaintiff thought he had improved, he still complained relative to his back and lower extremity. Dr. Meuleman found the patient “very obviously improving according to his statement and according to the present examination.” He was of the opinion that he would continue to improve relative to his back and leg condition and expected to see him approximately a month later for another examination and in the meantime he recommended that he continue under the care of Dr. Trahan.
Plaintiff returned to Dr. Meuleman on July 9, 1958 at which time he stated that he had continued under the treatment of Dr. Trahan but had not improved appreciably and was still complaining of pain in the back and both lower extremities. On this examination Dr. Meuleman found it extremely difficult to examine the plaintiff as he stood rigid and the mere touching of his skin caused him to wince and move about and he felt that the tightness of the musculature of the back was voluntary and he could give no definite significance to such tightness on this examination. In view of the fact that a herniated disc is stated to be at times active or inactive, that is, symptomatic or asymptomatic, it is important that on this examination Dr. Meuleman found the plaintiff to have lost the weakness of the long toe extensor and there was no longer any sensory dermatome pattern demonstrated to pin prick. The doctor was of the opinion that from a strict objective standpoint, the plaintiff appeared to be improving insofar as his back was concerned “but it becomes increasingly apparent from a subjective standpoint that medical treatment, per se, is probably not going to effect any type of cure.”
On July 30, 1958, Dr. Meuleman again saw the plaintiff who was still complaining of pain in the back and both lower extremities. He gave him a physical examination and he found the condition to be essentially the same with some improvement of the back, which he stated, “however, this has become stationary.”
On the 9th of September, 1958 plaintiff was again examined by Dr. Meuleman. Plaintiff’s principal complaint was low back pain, less, however, than it was in the past, but chiefly a right lower extremity pain, radiating in character, to the end of the foot. The examination revealed, “a good deal of muscle spasm in the back with restriction of motion. Subjectively, there were complaints on all movements of the back. * * * Initially there was seen a definite paresis of the long toe extensor on the right leg. This cleared after a period! of time and is now again returned. Sensory loss in the foot was again present.”' In summary, Dr. Meuleman on this occasion through an interpreter, explained tO' the plaintiff “that the examiner felt that he-had a definite injury to the back and that something further than observation and conservative treatment would be necessary.” As we understand, Dr. Meulemam was attempting to tell the plantiff that he-would need a myelogram and from his report in the record he was of the opinion, that it appeared that the plaintiff replied’ that he knew several people that were essentially paralyzed from the ears on dowm following such a procedure, so a decision was left up to the plaintiff who was to return within three weeks if he made up his mind as to whether he would be willing to consider such a procedure. It appears that the plaintiff was not willing.
*857 On November 5, 1958 he was again seen by Dr. Meuleman who stated in his report that the latter had been under observation periodically since May 7, 1958; he referred to his initial report in which he stated that the plaintiff showed definite paresis of the long toe extensor on the right together with a sensory loss to pin prick over the distribution of the fifth lumbar root; that ■on subsequent examination this sensory deficit cleared as did the paresis, although from time to time the weakness of the long toe extensor was picked up and it was present on this evaluation. On this examination and interview he also found that the plaintiff’s complaints were becoming more bitter and more bizarre; he also found at this time muscle spasm in the back “and at this time, as mentioned previously, shows paresis but not as complete as initially of the long toe extensor on the right.” At this examination Dr. Meuleman told the plaintiff that while he felt that he did have something wrong with his back, that he would not be able to cure him. Dr. Meuleman in his report stated that he recognized in this plaintiff an individual who did not appear to be able to be helped by medicine and he felt reasonably sure that even the most perfect end results from a clinical standpoint would still leave complaints, which would deny any improvement from treatment. One of the things which Dr. Meule-man felt would mitigate against rehabilitation and a return to work was the limited hip motion of the patient which he attributed to an incident in childhood, however, plaintiff steadfastly insisted that prior to this injury his hip joint motion was free and normal. Dr. Meuleman also felt that myelography would be indicated but he would prefer to have the patient treated by another individual as he felt that through the months there had been no inroads into getting the patient to have a better grasp of his situation. No return appointments were given the plaintiff, and at the conclusion of his examination he stated in his report that he preferred that the plaintiff be transferred elsewhere for treatment, which was explained to plaintiff’s other attending physician, Dr. Trahan.
On November 19, 1958 the claims representative of the defendant insurance company wrote the plaintiff asking that he report to Dr. A. N. Houston, of New Orleans, La., on Tuesday, December 2, 1958 for an examination. A letter was also written to Dr. Houston notifying him that he had written to the plaintiff requesting that he report to him on December 2 for examination, and also telling Dr. Houston to please feel free to call in any medical colleague in his area on whom he would like to depend for additional information concerning the plaintiff.
Dr. Houston thereupon got Dr. Wm. A. Roy, Dr. Howard Karr, and Dr. H. R. Soboloff on December 2nd to examine the plaintiff. Dr. Roy stated that his examination took approximately thirty to forty-five minutes. As a result of this examination he testified that he thought “that there is no question that he did have at one time shortly after his injury, good objective signs of back strain. These had disappeared by the time I examined him.” He found no objective signs of any back injury and attributed all of plaintiff’s apparent pain and trouble to the hip deformity, which in his opinion had not been aggravated by the accident in any manner.
Dr. Howard Karr was unalterably and positively of the opinion that if plaintiff was able to work prior to the accident that he was able to work on the date of his examination; that his hip deformity was not aggravated by the accident and was the only objective symptom of disability he could find. He stated that he did not find any objective manifestation of any low back injury. Counsel for plaintiff, on cross-examination, attempted to get Dr. Karr to say how long his examination took and was unable to get any answer except “I don’t know.” Dr. Karr did testify that it was possible for the symptoms of a ruptured disc to exist in the same patient at one given moment and not to exist, say, *858 within a period of one month, when he is being examined by another physician, however, on cross-examination he testified that plaintiff was not in remission at the time of his examination for he was complaining of pain. Dr. Karr also stated that he did not find any sign of intervertebral disc rupture in the plaintiff. He also stated that insofar as the X-rays taken by Dr. Tietelbaum, when asked if in his opinion they showed any intervertebral disc rupture that “The x-rays don’t show any in-tervertebral disc rupture but, the x-rays, under any circumstances couldn’t be expected to show that anyhow, so, there is no application here as far as those x-rays are concerned.”
In his deposition, Dr. Soboloff testified that plaintiff’s hip condition was the result of a teen-age injury and had nothing to do with his present injury whatsoever, and that if plaintiff was able to work before with this type of hip, then, it was his opinion that he could work again, as his examination was made. He found no objective signs of intervertebral disc pathology.
Thus we see that the medical testimony on behalf of the plaintiff and that on behalf of the defendant is at variance or in conflict as to the basis of plaintiff’s disability.
Counsel for the defendant makes an issue of the fact that plaintiff refused to have an examination by Dr. Meuleman at the request of the defendant insurance company a short time before the trial. Plaintiff was under no duty at that time to submit to this examination and we do not feel that it is to be construed against him.
The District Judge who tried the case concluded that the preponderance of the evidence was with the plaintiff, otherwise he would have accepted the testimony of the doctors who testified on behalf of the defendant, and dismissed plaintiff’s suit.
In considering the medical testimony in the case, it should be borne in mind that the doctors who testified on behalf of the plaintiff saw him immediately after the accident and Dr. Meuleman, who had the benefit of Dr. Shipp’s and Dr. Tra-han’s examination and X-ray pictures, examined the plaintiff thoroughly and apparently had extensive interviews with him, felt that the plaintiff was totally disabled and that the objective symptoms which he found led him to believe that he had a herniated disc. On the other hand, the three doctors, eminent specialists in their field, who testified on behalf of the defendant, examined the plaintiff only once, which took a comparatively short time, one doctor stating thirty to forty-five minutes. It is the province of the court as well as its duty to consider the record and evaluate the testimony, and the District Court in doing this rendered judgment for the plaintiff, and unless it is obviously or clearly wrong, under the settled jurisprudence of this state, it should not be disturbed by an appellate court. We do not find the judgment to be either clearly or obviously wrong.
Neither do we find the judgment of the lower court to be obviously or clearly erroneous in refusing penalties and attorney fees. The defendant insurance company did not cease compensation payments until after the examination by Doctors Roy, Karr and Soboloff and the report from them that in their opinion plaintiff’s disability was entirely due to the hip injury. They were definitely of the opinion that he was no more disabled at the time of their examination than he was at the time of the accident.
For the above and foregoing reasons the judgment of the District Court is affirmed.
Affirmed.